## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

STELLAR BEACH RENTALS, LLC
and JOHN KOZAK,

Civ. A. No. 1:23-cv-955

Plaintiffs,

**JURY TRIAL DEMANDED**

-vs-

REDSTONE ADVANCE, INC.,
GAVRIEL YITZCHAKOV a/k/a GABE ISAACOV,
SIMON YITZCHAKOV a/k/a SIMON ISAACOV,
CITY CAPITAL NY LLC D/B/A REDSTONE ADVANCE,
YOEL GETTER, NAIR & LEVIN, P.C.,
JOHN DOES 1-10, and
JOHN DOE INVESTORS 1-10,

Defendants.

-------------------------------------------------------------------X

## <u>COMPLAINT</u>

Plaintiffs STELLAR BEACH RENTALS, LLC and JOHN KOZAK (collectively "Plaintiffs"), as and for their Complaint against REDSTONE ADVANCE, INC., GAVRIEL YITZCHAKOV a/k/a GABE ISAACOV, SIMON ISAACOV, CITY CAPITAL NY LLC D/B/A REDSTONE ADVANCE, YOEL GETTER, JOHN DOES 1-10, and JOHN DOE INVESTORS 1-10, (collectively "Defendants"), state as follows:

## <u>NATURE OF THE ACTION</u>

1.     This is an action against two merchant cash advance ("MCA") companies that are controlled and manipulated, respectively, by the individual Defendants to carry out fraudulent schemes to collect upon unlawful debts and otherwise fraudulently obtain funds from Plaintiffs (and hundreds of other similarly situated victims) through the use of their sham MCA agreements as further defined below ("MCA Agreements").

2.     Unfortunately, the type of conduct by Defendants here is a ballooning national

problem that has raised the attention of both state and federal regulators.

3.     In November 2018, Bloomberg News and renowned journalist Bethany McLean (of Vanity Fair acclaim) published what would be the first in a series of groundbreaking news articles exposing the abuses of the MCA industry, and its use of confessions of judgments to seize out-of-state bank accounts.[1]

4.     The New York Legislature quickly took action, banning the use of out-of-state confessions of judgment in September 2019. In support, the Legislature cited Bloomberg News.

5.     More recently, on February 10, 2022, Bloomberg News exposed a new tactic being abused by the predatory MCA industry, and a tactic used by the Defendants here.

6.     Specifically, predatory MCA operators operate out of New York but abuse an apparent loophole under Connecticut procedural law to collect upon their unlawful debts. In doing so, the operators freeze out-of-state bank accounts by simply serving legal papers (which have not been reviewed or scrutinized by any court) on a bank that has a branch located in Connecticut. As justification for their bank freezes, the operators represent and attest under oath that their small business victims owe them a debt and that the operators are unaware of any defenses to their claims.

7.     According to Bloomberg News, this Connecticut loophole was used more than 180 times in 2021. The result of this tactic is often catastrophic because the operators can freeze out-of-state bank accounts without any notice whatsoever.  Once frozen, the operators can then extort payment under duress due to their victims' need to save payroll or pay other necessary business expenses, such as insurance, taxes, rent and inventory.

8.     This tactic is especially harsh because even when the small business victim

---

[1] https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html; https://www.bloomberg.com/confessions-of-judgment

capitulates to the operator's extortionate demands, it is often too late because the release of those bank accounts may take days to unfreeze due to the processing delays and procedural constraints of individual banks and their levy departments.

9.      This in fact has occurred with Plaintiffs as it relates to Defendants CITY CAPITAL NY LLC and GETTER, who recently levied against Plaintiffs' accounts without any notice whatsoever, creating catastrophic harm for Plaintiffs.

10.      In doing so, Defendants CITY CAPITAL NY LLC and GETTER violated 42 U.S.C. § 1983 by violating Plaintiffs' Fourteenth Amendment right to Due Process under the color of Connecticut state law. Among these intentional violations of due process, Defendants, like here, knowingly and purposely issue Prejudgment Writs of Attachment to third-party banks without first filing a complaint in state court, and without serving notice. Instead, Defendants require Plaintiffs to execute form contracts of adhesion waiving their rights to a hearing, while at the same time agreeing to the jurisdiction of two different states, Connecticut and New York. Thus, the first notice received by Plaintiffs is when their bank accounts become frozen.

11.      Plaintiffs here are victims of Defendants' unlawful lending practices.

12.      Plaintiff STELLAR BEACH RENTALS, LLC is a real estate company in North Carolina that desperately needed a cash infusion.

13.      As a result, on August 16, 2022, Plaintiff STELLAR BEACH RENTALS, LLC entered into an agreement with Defendant REDSTONE ADVANCE, INC. ("RSA").

14.      Plaintiff JOHN KOZAK, who is the principal of STELLAR BEACH RENTALS, LLC, was forced to enter into a personal guarantee under the agreement.

15.      Defendant RSA, who was supposed to advance $1 million under this agreement, in fact only advanced $960,000, claiming $40,000 in various "fees."

16.     Then, Plaintiffs were somehow supposed to pay back the sum of ~$1.36 million by Defendant RSA pulling ~$57,000 out of the Plaintiff's bank account every week for 24 weeks.

17.     In other words, Defendant RSA was going to receive $360,000 in interest on a $1,000,000 loan (36%) in only 6 months.

18.     This is an effective interest rate of 72%. The maximum interest rate permitted under the criminal usury laws of New York is 25%. Accordingly, Defendants have been taking interest that is three times as large as the amount allowed under the criminal laws of this State.

19.     The interest rate is even far worse due to Defendants' typical scheme of only advancing a portion of the amount promised, and then lending the merchant back its money, at a criminally usurious interest rate.

20.     Here, for example, Defendant RSA "purchased" $1,360,000 but only advanced $960,000.

21.     Thus, Defendant was earning $400,000 interest on only $960,000, an interest rate of more than 41% for the 24 weeks, or more than 82% for the year.

22.     When the payments became too difficult to keep up with, Plaintiff was forced to enter into a second agreement with Defendant RSA just one month later, on September 15, 2022, this time for $475,000, with a repayment of ~$689,000, which would be repaid by Defendant RSA pulling ~$43,000 out of Plaintiff's bank account every week for 16 weeks.

23.     In other words, Defendant RSA was going to receive ~$214,000 in interest on a $475,000 loan (45%) in only 4 months.

24.     This is an effective interest rate of 135%, or more than five times the maximum interest rate allowed under the criminal laws of this State.

25.     Once again, the real interest rate was even higher, because Defendants RSA once

again withheld substantial amounts for alleged fees.

26.     Just a few months later, once again suffering under the crushing debt of the payments, Plaintiff was forced to enter into a third agreement with Defendant RSA, a "refinance," on or about December 1, 2022, this time for $1.575 million with a repayment of ~$2.2 million, which would be repaid by Defendant RSA pulling ~$92,000 out of Plaintiff's bank account every week for 24 weeks.

27.     In other words, Defendant RSA was going to receive ~$625,000 in interest on a $1.575 million dollar loan (40%) in only 6 months.

28.     This is an effective interest rate of 80%, or more than three times the maximum interest rate allowed under the criminal laws of this State.

29.     Even worse, Defendant RSA only sent Plaintiff ~$668,000 for this "refinanced" loan, stating that the remaining amount was to pay off the existing loans.

30.     Thus, even though Plaintiff had already paid back over $1.2 million dollars, or nearly all the money he had received, Defendant RSA still deducted $907,000, in effect creating a new loan for ~$668,000 with a repayment of ~$2.2 million, or more than $1.5 million interest on a $668,000 loan.

31.     In other words, Defendant RSA was going to receive 225% interest for a 6-month period of time, or an effective interest rate of 450%, 18 times more than the maximum interest rate allowed under the criminal laws of this State.

## **THE PARTIES**

32.     Plaintiff STELLAR BEACH RENTALS, LLC is a North Carolina limited liability company, with its principal place of business located in Holly Springs, North Carolina.

33.     Plaintiff JOHN KOZAK is an individual and citizen of North Carolina.

34.     Defendant REDSTONE ADVANCE, INC. is a Florida corporation with its principal place of business at 1688 N Meridian Ave., Suite 440, Miami Beach, FL 33139.

35.     Upon information and belief, Defendants GAVRIEL YITZCHAKOV a/k/a GABE ISAACOV and SIMON ISAACOV are the principals of Defendant REDSTONE ADVANCE, INC.

36.     Defendant CITY CAPITAL NY LLC D/B/A REDSTONE ADVANCE ("CITY CAPITAL"), is a New York limited liability company with a registered agent address at 418 Broadway, Ste Y, Albany, NY 12207.

37.     Upon information and belief, Defendant YOEL GETTER is the principal of Defendant CITY CAPITAL.

38.     Upon information and belief, Defendant GETTER and his relative Yisroel a/k/a Sruly Getter began working in the MCA field in 2020, working with a notorious, convicted felon who spent several years in jail for loan sharking and drug trafficking, and who has since orchestrated fraudulent MCA schemes as discussed and reported by Bloomberg News.

39.     Upon information and belief, the Getters have been involved in multiple MCA schemes involving several shell entities including GoFund Advance, LLC, Funding 123, LLC, Merchant Capital, LLC, and Alpha Recovery Partners, LLC.

40.     Upon information and belief, the Getters regularly uses the Connecticut State Court system to take advantage of vulnerable victims like Plaintiffs.

41.     Defendant NAIR & LEVIN, P.C., ("NAIR & LEVIN") is a Connecticut professional corporation with a business address of 707 Bloomfield Avenue, Bloomfield, Connecticut 06002.

42.     Defendant NAIR & LEVIN aids and abets the other defendants in their fraudulent

scheme as discussed herein.

43.    Defendants John Does 1-10 are additional principals of RSA and/or CITY

CAPITAL, whose identities are at this time unknown to Plaintiffs, but who are full participants

in the fraudulent criminal enterprises discussed herein.

44.    Defendants John Doe Investors 1-10 are individuals and organizations whose

identities are at this time unknown to Plaintiffs, but who knowingly fund, assist, and profit from

the fraudulent criminal enterprise discussed herein, with full knowledge of the nature of the

activity in which the enterprises are engaged.

## JURISDICTION

45.    Each Defendant is subject to the personal jurisdiction of this Court because each

Defendant regularly transacts business within the State of New York, has purposefully availed

itself of the laws of New York for the specific transactions at issue, or has selected New York as

the forum for all disputes related to the transactions.

46.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a),

because (i) Plaintiff and Defendants are citizens of different states, and (ii) the amount in

controversy exceeds $75,000 exclusive of interest and costs.

47.    This Court additionally has subject-matter jurisdiction over this dispute pursuant

to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and

Corruption Organizations Act, 18 U.S.C. §§ 1961–68 ("RICO").

48.    This Court additionally has subject-matter jurisdiction over this dispute pursuant

to 18 U.S.C. § 1030 based on Plaintiffs' claims for violation of The Computer Fraud and Abuse

Act ("CFAA").

49.    The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because

they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

50.    This Court also has jurisdiction under 28 U.S.C. § 2201 *et. seq.*

51.    Venue is proper because each Defendant regularly conducts business within this judicial district.

## COMMON FACTUAL ALLEGATIONS

**A.    The Predatory MCA Industry.**

52.    The MCA Industry spawned from the 2008 Financial Crisis. One of the earliest MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."[2] As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock." Just like in the movie, MCA companies utilize high-pressure boiler room tactics, employing salespersons with absolutely no financial background whatsoever.

53.    As Bloomberg previously reported, the MCA Industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[3] The MCA Industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy." *Id.* As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage. There's no license you need to file for. It's pretty much unregulated." *Id.*

**B.    The Sham.**

54.    Many states, like New York, have laws prohibiting the predatory interest rates. In order to evade these criminal usury laws, MCA companies disguise their agreements as

---

[2] https://www.sec.gov/litigation/admin/2008/34-58574.pdf
[3] https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans

"purchases of future receivables." MCA companies promote a fiction that, rather than making loans to merchants, they are purchasing, at a discount, a fixed amount of the merchant's future receivables, usually to be repaid through a fixed daily or weekly payment that purportedly represents a percentage of the merchant's receipts. The form of the contract thus allows MCAs to represent to courts that they, not the merchants, assume the risk that the merchants will fail to generate receivables. But the picture they paint is contrary to reality. By operation of their agreements' default rights and remedies, the MCA companies exert complete control over the relationship and compel their merchants to make the fixed payments or suffer the consequences.

### C.    The Bloomberg Awakening.

55.    For nearly a decade, MCAs operated under the radar of regulators, compiling over 25,000 confessions of judgment against small businesses and their individual owners. That all changed on November 20, 2018 when Bloomberg News and renowned journalist Bethany McLean published what would be the first in a series of groundbreaking news articles exposing the abuses of the predatory MCA industry.[4]

56.    As a direct result of the light shined on these abuses, the New York Legislature quickly enacted legislation extinguishing their weapon of mass destruction, the confession of judgment, expressly citing the Bloomberg articles as its inspiration.

57.    Congress also took notice. On June 26, 2019, the United States House of Representatives held a hearing titled: "Crushed by Confessions of Judgment: the Small Business Story." As explained by Professor Hosea Harvey, a contracts expert from Temple University, small businesses are just as susceptible to predatory lending as unsophisticated individuals.[5]

---

[4] https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html
[5] https://www.congress.gov/event/116th-congress/house-event/LC64251/text?s=1&r=60

58.    Regulators have also taken action. On July 31, 2020, the New York Attorney General brought suit against a group of MCA companies, as well as their principals, alleging that their MCA agreements constitute criminally usurious loans.[6]

59.    On July 31, 2020, the Securities and Exchange Commission shut down an MCA company. In its complaint, the SEC alleged that Par Funding "made opportunistic loans, some of which charged more than 400% interest, to small businesses across America."[7] The FBI thereafter raided its offices, confiscating a cache of guns, millions of dollars in cash, and a private airplane.[8]

60.    On June 10, 2020, the Federal Trade Commission filed a complaint against John Braun and his various companies alleging various fraudulent and deceptive practices in connection with MCAs. *See* Ex. 6.[9]

61.    On August 3, 2020, the Federal Trade Commission filed a complaint against Yellowstone.[10] Notably, the FTC complained that Yellowstone "unlawfully withdrew millions of dollars in excess payments from their customers' accounts, and to the extent they provided refunds, sometimes took weeks or even months to provide them." *Id.*

62.    On November 10, 2020, the California Commission of Financial Protection and Innovation entered into a Consent Order with Allup Financial LLC, finding that its MCA agreements were lending transactions subject to the California Finance Lenders Law, and barring the MCA company from doing business in California unless and until it complies with its laws.[11]

---

[6] https://ag.ny.gov/press-release/2020/attorney-general-james-sues-predatory-lender-threatened-violence-and-kidnapping

[7] https://www.sec.gov/litigation/litreleases/2020/lr24860.htm

[8] https://www.inquirer.com/news/par-funding-better-financial-plan-joseph-laforte-dean-vagnozzi-20200731.html

[9] https://www.ftc.gov/system/files/documents/cases/192_3252_rcg_advances_-_complaint.pdf

[10] https://www.ftc.gov/news-events/press-releases/2020/08/ftc-alleges-merchant-cash-advance-provider-overcharged-small

[11] https://dfpi.ca.gov/wp-content/uploads/sites/337/2020/11/Consent-Order-Allup-Finance-LLC.pdf

63.     On December 8, 2020, the New Jersey Attorney General also filed suit against Yellowstone, alleging it cheated "financially-strapped small businesses and their owners out of millions of dollars nationwide by luring them into predatory loans disguised as cash advances on future receivables with interest rates far exceeding the interest rate caps in the State's usury laws."[12]

64.     On December 23, 2020, New York signed into law the Small Business Truth in Lending Law, which is aimed at "protecting small business owners," and "requires key financial terms such as the amount financed, fees and annual percentage rate (APR) to be disclosed at the time a credit provider or broker makes an offer of financing of $500,000 or less."[13]

65.     As Gretchen Morgensen of NBC News recently reported, however, the financial greed of predatory lenders, like Defendants, has only accelerated in the wake of Covid-19.[14]

**D.     The Sea Change in Law.**

66.     Prior to the Bloomberg Awakening, courts routinely rejected attempts by small business victims seeking to vacate the many thousands of confessions of judgments filed by MCA companies. Courts primarily denied those attempts on the procedural basis that a plenary action must be filed instead of merely seeking to vacate by motion. One court went so far as to sanction the attorney for even bringing the motion. *See, e.g., Yellowstone Capital LLC v. Central USA Wireless LLC*, 2018 N.Y. Misc. LEXIS 2516, *2 (N.Y. Sup. Ct., Erie Cty Jun. 25, 2018) (citing *Yellowstone Capital, LLC v. Jevin*, Index No. 802457/2017 (N.Y. Sup. Ct. Erie Co. Oct. 6, 2017)).

---

[12] https://www.njoag.gov/ag-grewal-files-suit-against-yellowstone-capital-llc-and-associated-companies-alleging-the-merchant-cash-advance-companies-targeted-small-businesses-with-predatory-lending-and-abusive-collection-pract/
[13] https://www.jdsupra.com/legalnews/gov-cuomo-signs-new-york-small-business-9450503/
[14] https://www.nbcnews.com/business/economy/feds-crack-down-lenders-targeting-small-businesses-high-interest-loans-n1236167

67.    The tide has since turned in the wake of the Bloomberg articles. Most notable is the decision by Judge Nowak, a Commercial Division Justice out of Erie County—a favorite forum for MCAs given Upstate New York's more conservative political leanings. *See McNider Mar., LLC v Yellowstone Capital, LLC*, 2019 N.Y. Misc. LEXIS 6165 (N.Y. Sup. Ct., Erie Cty Nov. 19, 2019). Notably, Judge Nowak reversed his own prior decision in *Yellowstone Capital, LLC v. Jevin*, *supra*, where he previously held that the very same Yellowstone agreement was not a loan as a matter of law. This time, upon further reflection, Judge Nowak not only upheld the claims of usury, but also upheld the RICO claims. Numerous courts have followed suit. *See, e.g., Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims); *LG Funding LLC v. United Senior Properties of Olathe LLC,* 122 N.Y.S.3d 309 (2d Dep't. 2020); *American Resources Corp. v. C6 Capital, LLC*, 2020 N.Y. Misc. LEXIS 10725, *6 (N.Y. Sup. Ct., Kings Cty. Dec. 16, 2020); *Funding Metrics LLC v. NRO Boston*, 2019 N.Y. Misc. LEXIS 4878 (N.Y. Sup. Westch. Cty. Aug. 28, 2019); *Funding Metrics, LLC v. D & V Hospitality*, 62 Misc.3d 966 (N.Y. Sup. Westch. Cty. Jan. 7, 2019), *rev'd on other grounds*.

68.    Numerous federal courts, including this Court, have also joined the revolution. *See Lateral Recovery LLC v. Queen Funding LLC*, Case No. 21-civ-9607 22, 2022 U.S. Dist. 129032 (S.D.N.Y. July 20, 2022) (upholding RICO claims under MCA agreement); *Fleetwood Servs. LLC v. Ram Capital Funding, LLC*, Case No. 20-cv-5120 (LJL), 2022 U.S. Dist. LEXIS 100837 at *32 (S.D.N.Y. June 6, 2022) (applying risk-transfer analysis to an MCA agreement to conclude agreement was a criminally usurious loan in granting summary judgment on merchant's unlawful debt RICO collection claims); *Haymount Urgent Care PC v. GoFund Advance, LLC*,

22-cv-1245 (JSR), 2022 WL 2297768, *16 (S.D.N.Y. June 27, 2022) (same); *Fleetwood Servs., LLC v. Complete Bus. Sols. Grp.*, 374 F.Supp.3d 361 (E.D. Pa. 2019) (same); *NRO Boston v. Funding Metrics*, 2018 U.S. Dist. LEXIS 239152 (E.D. Pa. May 23, 2018) (same); *Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims).

69.    So has New York's highest court. Most notably, a member of New York's highest court, just recently advised in *dicta* that MCA transactions, like here, more closely resemble loans subject to New York's usury laws rather than bona fide sales of receivables:

> Although the GTR and CMS agreements are described as 'factoring' agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and more like high-interest loans that might trigger usury concerns (*see Adar Bays, LLC v GeneSYS ID*, NE3d, 2021 NY Slip Op 05616 [2021]). Nevertheless, for the purpose of these certified questions, we are asked to assume the judgments rendered on those agreements are valid.

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021).

### E.    The MCA Agreement is Substantively and Procedurally Unconscionable.

70.    The MCA Agreement is an unconscionable contract of adhesion that is not negotiated at arms-length.

71.    Instead, the MCA Agreement contains one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that each of the transactions, including those involving the Plaintiffs, are really loans.

72.     Among these one-sided terms, the MCA Agreement includes: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney to settle all obligations due to the MCA Company and (15) a power of attorney authorizing the MCA company to "file any claims or taken any action or institute any proceeding…"

73.     The MCA Agreement is also unconscionable because it contains numerous knowingly false statements. Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily or weekly payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily or weekly payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee or Underwriting Fee.

74.     The MCA Agreement is also unconscionable because it is designed to fail. Among other things, the MCA Agreement is designed to result in a default in the event that the

merchant's business suffers any downturn in sales by preventing the merchant from obtaining other financing and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

75.     The MCA Agreement also contains numerous improper penalties that violate New York's strong public policy. Among these improper penalties, the MCA Agreement (1) entitles the MCA company to attorneys' fees, (2) accelerates the entire debt upon an Event of Default, and (3) requires the merchant to turn over 100% of all of its receivables if it misses just one fixed daily payment.

76.     The weekly payments under the MCA Agreements described below were fixed and absolute and the agreements' reconciliation provision was a sham.

77.     Defendants did not maintain reconciliation departments and did not have anyone trained or otherwise dedicated to performing any reconciliation of a merchant's accounts. Indeed, the MCA Agreement did not contain any functioning contact information whereby Plaintiffs could even request a reconciliation within the terms of that provision.

**F.    The Enterprise Intentionally Disguises the True Nature of the Transactions.**

78.     Despite the documented form, the transactions are, in economic reality, loans that are absolutely repayable. Among other hallmarks of a loan:

(a)     The Payments are fixed and the so-called reconciliation provision are mere subterfuge to avoid this state's usury laws. Rather, just like any other loan, the Purchased Amount is to be repaid within a specified time;

(b)     The default and remedy provisions purport to hold the merchants absolutely liable for repayment of the Purchased Amount. The loans seek to obligate the merchants to ensure sufficient funds are maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants are in default and, upon default, the outstanding balance of the Purchased Amount becomes immediately due and owing;

(c)     While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount is paid, the merchants retain all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, the Enterprise merely acquires a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)     The transactions are underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)     The Purchased Amount is not calculated based upon the fair market value of the merchant's future receivables, but rather is unilaterally dictated by the Enterprise based upon the interest rate it wants to be paid. Indeed, as part of the underwriting process, the Enterprise does not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)     The amount of the Payments is determined based upon when the Enterprise wants to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)     The Enterprise assumes no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constitutes a default under the agreements;

(h)     The Enterprise requires that the merchants undertake certain affirmative obligations and make certain representations and warranties that are aimed at ensuring the company will continue to operate and generate receivables and a breach of such obligations, representations and warranties constitutes a default, which fully protects the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i)     The Enterprise requires that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew would be breached from day one.

## FACTS SPECIFIC TO PLAINTIFFS

### A.     STELLAR BEACH RENTALS, LLC

79.     Plaintiff STELLAR BEACH RENTALS, LLC ("STELLAR BEACH") is a real estate company in North Carolina that buys, sells, and rents properties.

80.     Plaintiff JOHN KOZAK ("JOHN") is the principal of STELLAR BEACH.

81.    For months JOHN had been receiving calls from Defendant RSA seeking his business.

82.    In trying to solicit JOHN, GABE and SIMON ISAACOV, the principals of RSA and the individuals calling him, stated that they had taken over the MCA business of their older brother, Joseph.

83.    JOHN had worked successfully in the past in obtaining merchant cash advance loans from Joseph, and had never had any issues with him.

84.    JOHN even called Joseph, who vouched for his brothers and told JOHN to work with them.

85.    In August 2022, JOHN was in need of a cash infusion, and so he reached out to RSA.

86.    JOHN had a few properties under contract with closing dates that were nearing, and so he just needed a short-term loan to hold him over until the properties closed, at which point he could immediately pay back the loans.

87.    GABE and SIMON informed JOHN that the best they could get was a $1 million dollar loan to be repaid at $1.35 million over 6 months, but that once he started making some payments, they would be able to get him a longer-term loan over 12 months with more manageable payments.

88.    Accordingly, JOHN entered into the first MCA agreement on or about August 16, 2022.

89.    On its face, the agreement provided Plaintiff an advance of $1 million ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of ~$1.36 million (the "Purchased Amount") was

repaid.

90.    On its face, the agreement provided that the Purchased Amount was to be repaid through weekly ACH withdrawal in the amount of ~$57,000 (a "Weekly Payment"), which would result in the amount being repaid in 24 weeks, which, on its face, translates to an annual interest rate of more than 72% per annum or approximately 3 times the maximum 25% rate permitted under New York Penal Law.

91.    Although the agreement stated that this was only 25%, simple math shows that this was actually a 36% return over 6 months.

92.    The fixed Weekly Payment was disguised as an alleged "good-faith estimate" equal to 25% of the company's weekly revenues.

93.    As stated, however, simple math reveals that this was 36% of the loan, not 25%.

94.    Moreover, the estimated Weekly Payment did not remotely reflect 25% or 36% of STELLAR BEACH's weekly revenues since STELLAR BEACH bought and sold properties and so did not have weekly revenues, further revealing the blatant nature of this transaction as a loan with fixed interest payments and not the purchase of future receivables, since there were no receivables during the time the payments would be made.

95.    Rather, the estimated weekly amount was dictated by RSA based on the length of the payment term of the loan, which was 6 months.

96.    Rather than sending the full $1 million dollars, RSA only sent $960,000, withholding $40,000 for various alleged set-up and underwriting fees.

97.    (At a loan of only $960,000, the interest was in fact $400,000, or more than 41% of the loan, which would translate to an annual interest rate of more than 82% for the year.)

98.    However, within just a matter of a few short weeks, the payments became too

difficult to make as Plaintiff did not have any money coming in.

99.    Plaintiff called up RSA, and was forced to enter into a second agreement, on or about September 15, 2022.

100.    Once again, SIMON and GABE told him not to worry, and that they were working on a better, longer-term loan for him, which they hoped to obtain for him soon.

101.    On its face, the second agreement provided Plaintiff an advance of $475,000 in exchange for the purported purchase of all of Plaintiff's future receipts until such time as the amount of ~$689,000 was repaid.

102.    On its face, the agreement provided that the Purchased Amount was to be repaid through weekly ACH withdrawal in the amount of ~$43,000, which would result in the amount being repaid in 16 weeks, which, on its face, translates to an annual interest rate of 135% per annum or more than 5 times the maximum 25% rate permitted under New York Penal Law.

103.    Although the agreement once again stated that this was only 25%, simple math shows that this was actually a 45% return over 4 months.

104.    The fixed Weekly Payment was disguised as an alleged "good-faith estimate" equal to 25% of the company's weekly revenues.

105.    As stated, however, simple math reveals that this was 45% of the loan, not 25%.

106.    Moreover, the estimated Weekly Payment did not remotely reflect 25% or 45% of STELLAR BEACH's weekly revenues since STELLAR BEACH bought and sold properties and so did not have weekly revenues, further revealing the blatant nature of this transaction as a loan with fixed interest payments and not the purchase of future receivables, since there were no receivables during the time the payments would be made.

107.    Rather, the estimated weekly amount was dictated by RSA based on the length of

the payment term of the loan, which was 4 months.

108.    Once again, Plaintiff was not sent the full $475,000, making the interest even larger.

109.    However, the real estate market suddenly fell out as interest rates faced sudden, steep hikes, and Plaintiff's prospective buyers did not close on the contracts.

110.    Additionally, Hurricane Ian swept through, causing delays and cancellations, and creating the need for certain necessary repairs.

111.    Accordingly, the properties were unexpectedly not sold, and Plaintiff found itself with this massive weekly debt.

112.    By December, suffering under this crushing debt, Plaintiff once again could not afford to make the payments, and so JOHN once again reached out to GABE and SIMON, and explained the situation of what had occurred.

113.     GABE and SIMON told JOHN that they were still working on the long-term loan and hoped to have it for him soon, but that in the interim, they could give him a refinanced loan.

114.    Thus, Plaintiff was forced to enter into a third agreement on or about December 1, 2022.

115.    On its face, the third agreement provided Plaintiff an advance of $1.575 million dollars in exchange for the purported purchase of all of Plaintiff's future receipts until such time as the amount of ~$2.2 million dollars was repaid.

116.    On its face, the agreement provided that the Purchased Amount was to be repaid through weekly ACH withdrawal in the amount of ~$92,000, which would result in the amount being repaid in 24 weeks, which, on its face, translates to an annual interest rate of 80% per annum or more than 3 times the maximum 25% rate permitted under New York Penal Law.

117.    Although the agreement once again stated that this was only 25%, simple math shows that this was actually a 40% return over 6 months.

118.    The fixed Weekly Payment was disguised as an alleged "good-faith estimate" equal to 25% of the company's weekly revenues.

119.    As stated, however, simple math reveals that this was 40% of the loan, not 25%.

120.    Moreover, the estimated Weekly Payment did not remotely reflect 25% or 40% of STELLAR BEACH's weekly revenues since STELLAR BEACH bought and sold properties and so did not have weekly revenues, further revealing the blatant nature of this transaction as a loan with fixed interest payments and not the purchase of future receivables, since there were no receivables during the time the payments would be made.

121.    Rather, the estimated weekly amount was dictated by RSA based on the length of the payment term of the loan, which was 6 months.

122.    Even worse, RSA did not send $1.575 million or anything close to it.

123.    Instead, RSA only sent ~$668,000, claiming that the balance had been used to pay off the earlier 2 loans.

124.    Thus, even though Plaintiff had already paid back over $1.2 million dollars, or nearly all the money he had received, Defendant RSA still deducted $907,000, in effect creating a new loan for ~$668,000 with a repayment of ~$2.2 million, or more than $1.5 million interest on a $668,000 loan.

125.    In other words, Defendant RSA was going to receive back 225% interest for a 6-month period of time, or an effective interest rate of 450%, 18 times more than the maximum interest rate allowed under the criminal laws of New York.

126.    By January 2023, Plaintiff could not make any more payments, having essentially

run out of any available funds, and Plaintiff missed a couple of payments.

127.    The next thing Plaintiffs knew, they found out that their bank accounts had been frozen.

128.    As Plaintiffs were informed by their banks, apparently Defendant CITY CAPITAL had served a "legal order" signed by Defendants GETTER and NAIR & LEVIN attaching and asserting a lien against the bank accounts for ~$1.8 million dollars.

129.    Plaintiffs had received no notice whatsoever before this money was withdrawn from their accounts.

130.    Apparently, Defendant CITY CAPITAL had utilized the Connecticut loophole exposed by Bloomberg News, and levied Plaintiffs' assets in North Carolina (despite the fact that the Connecticut loophole only applies to assets in Connecticut) with nothing more than the signature of Defendants GETTER and NAIR & LEVIN.

131.    Upon information and belief, no action was ever filed in Connecticut, in violation of the Connecticut loophole statute.

132.    Moreover, upon information and belief, Defendants accessed Plaintiffs' bank account in order to discover other bank accounts used by Plaintiffs so that they could be attached and levied as well.

133.    Plaintiffs had never dealt with CITY CAPITAL or GETTER, and had no idea why they had any involvement, and so Plaintiffs reached out to SIMON and GABE demanding to know what was going on and asking who GETTER was.

134.    SIMON informed JOHN that GETTER "handled their legal for them," and gave JOHN GETTER's phone number and said he was free to call.

135.    However, when JOHN called GETTER, GETTER informed JOHN that in fact it

was his money and his deal and not SIMON and GABE's.

136.    Had Plaintiffs known that GETTER had any involvement, they never would have signed any agreements with Defendants, since as mentioned above, the Getters are notorious amongst MCA lenders for their fraudulent practices.

137.    Defendant NAIR & LEVIN undoubtedly knew that Defendants CITY CAPITAL and GETTER were not parties to the MCA Agreements, since the MCA Agreements were entered into with Defendant REDSTONE, and NAIR & LEVIN had a copy of the contract attached to their papers.

138.    Notwithstanding the undoubted knowledge that Defendants CITY CAPITAL and GETTER had nothing to do with the MCA Agreements between Plaintiffs and Defendant REDSTONE, Defendant NAIR & LEVIN nevertheless prepared the Connecticut prejudgment attachment papers by stating that Defendant CITY CAPITAL does business as "Redstone Advance," even though Defendant REDSTONE is a fully incorporated and existing separate entity owned by Defendants GABE and SIMONE ISAACOV, also undoubtedly known by Defendant NAIR & LEVIN.

139.    Accordingly, NAIR & LEVIN and GETTER, who also signed the document, knew that this alleged Connecticut prejudgment remedy on behalf of Defendant CITY CAPITAL was fraudulent, but nonetheless prepared the papers so that they could freeze Plaintiffs' money and attempt to extort Plaintiffs into settling.

140.    Once Defendants froze Plaintiffs' assets, they then began trying to get Plaintiffs to sign a "settlement" agreement for the ~$1.8 million they allege is outstanding, together with a waiver and release of any claims by Plaintiffs, in order to release Plaintiffs' accounts.

141.    Plaintiffs refused.

142.    Defendants then began making threats against Plaintiffs that they would obtain a judgment against Plaintiffs and take all the properties that had been collateralized and cross-collateralized by the agreement.

   **H.    Fraudulent Scheme**.

143.    The Defendants have unlawfully provided usurious loans by way of the sham MCA Agreements.

144.    Defendants have engaged in predatory and fraudulent conduct that allowed them to fraudulently extract even more monies from Plaintiffs.

145.    Among other things, Defendants fraudulently induced Plaintiffs to enter into contracts not reflecting the terms agreed upon and with false promises of future restructuring; Defendants fraudulently charged Plaintiff tens of thousands of dollars in so-called "Origination Fees" and "Underwriting Fees" to cover the costs of due diligence that they never performed and "ACH fees" to cover ACH operations they claimed were "labor intensive" but, in actuality, were fully automated and cost a mere fraction of the fees charged to Plaintiff; Defendants fraudulently accessed Plaintiffs' bank account in order to determine where Plaintiffs may have been holding other assets; and Defendants fraudulently attempted to extort Plaintiffs into signing a settlement and release.

**FIRST CAUSE OF ACTION**
**(RICO: 18 U.S.C. § 1962)**

146.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

   **A.    The Unlawful Activity.**

147.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

148.    In 1965, the Legislature of New York commissioned an investigation into the

illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

149.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp*., 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

150.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

151.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

152.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

153.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

154.    Like here, this was a purely artificial device used by the loan-shark to evade the law—an evasion that the Legislature sought to prevent.

155.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.    Culpable Persons.**

156.    GABE ISAACOV, SIMON ISAACOV, and YOEL GETTER are "persons"

within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is an individual capable of holding a legal interest in property.

157.    Upon information and belief, GABE and SIMON are the owners of RSA, which has less than ten (10) employees.

158.    Upon information and belief, GETTER is the owner of CITY CAPITAL, which has less than ten (10) employees.

**C.    The Enterprise.**

159.    Defendants GABE ISAACOV, SIMON ISAACOV, YOEL GETTER, RSA, CITY CAPITAL, NAIR & LEVIN, John Does 1-10, and their Defendant John Doe Investors 1-10 constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

160.    The Enterprise is associated in fact for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at many multiples above the enforceable rate under the laws of New York and other states.

161.    Since at least 2022 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

162.    The debt, including such debt evidenced by the agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are many multiples higher than the legal rate

permitted under New York Penal Law §190.40.

163.    The members of each Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

164.    The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

165.    The members of each Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of transporting fraudulently-obtained money interstate.

166.    The Enterprise's conduct constitutes interstate transportation of stolen property within the meaning of 18 U.S.C. 2314, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

### D.    The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise.

167.    The RICO Persons have organized themselves and each Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

168.    Upon information and belief, GABE ISAACOV, SIMON ISAACOV, and/or YOEL GETTER is(are) the principal(s) of the Enterprise. He(They) is(are) responsible for the

day-to-day operations of the Enterprise and has(have) final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

169.    In his(their) capacity as principal(s), GABE ISAACOV, SIMON ISAACOV, and/or YOEL GETTER is(are) responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily/weekly payments via ACH withdrawals; and (iii) the method and form used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations. All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Plaintiffs.

170.    GABE ISAACOV, SIMON ISAACOV, and/or YOEL GETTER has(have) taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of each Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

171.    Upon information and belief, NAIR & LEVIN is the law firm that REDSTONE, CITY CAPITAL, GABE ISAACOV, SIMON ISAACOV, and/or YOEL GETTER use to unlawfully freeze and levy against victims' bank account, fraudulently induce to sign "settlement" agreements and releases, and collect upon the unlawful loans.

172.     All of the individual Defendants have ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the other Enterprise members.

173.     GABE and SIMON ISAACOV have operated RSA together with the related Enterprise companies as part of an unlawful enterprise to collect upon unlawful debt, commit wire fraud, and cause the interstate transportation of money obtained through fraud. Pursuant to its membership in the Enterprise, RSA has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments to further collect upon the unlawful debt.

174.     YOEL GETTER has operated CITY CAPITAL together with the related Enterprise companies as part of an unlawful enterprise to collect upon unlawful debt, commit wire fraud, and cause the interstate transportation of money obtained through fraud. Pursuant to its membership in the Enterprise, CITY CAPITAL has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments to further

collect upon the unlawful debt.

175.    The Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of the other Enterprise Members.

176.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing RSA and/or CITY CAPITAL with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreements at issue in this case, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

177.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

178.    In this case, RSA and CITY CAPITAL, through the respective individual Defendants: (i) solicited borrowers; (ii) pooled funds from Investors to fund the agreements; (iii) underwrote the agreements; (iv) entered into the agreements; and (v) collected upon the unlawful debt evidenced by the agreements by effecting wire transfers from the bank accounts of Plaintiffs.

### E.    Interstate Commerce

179.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

180.    Specifically, members of each Enterprise maintain offices in New York and/or Connecticut and/or Florida and use personnel in these offices to originate, underwrite, fund,

service and collect upon the usurious loans made by the Enterprise to entities in North Carolina, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

181.    In the present case, all communications between the members of the Enterprise were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the agreements, fund the advances under each of the agreements and collect the payments via interstate electronic ACH debits.

182.    In addition, at the direction of the respective Defendants, agreements were executed in states outside of New York, and original copies of the Agreements were sent to each Enterprise, through Defendants, at their offices in New York via electronic mail.

**F.    Injury and Causation.**

183.    Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

184.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected criminally usurious loan payments, defaulted loans, and an inability to carry on their business. Plaintiffs were forced to make weekly payments pursuant to the MCA Agreement that amounted to unconscionable interest rates.

185.    Under controlling New York law, the MCA Agreements are void *ab initio*. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 157 N.Y.S.3d 800, 179 N.E.3d 612 (2021).

186.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

187.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

188.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

189.     Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed with members of each Enterprise to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

190.    By and through the Enterprise Members' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants and the Enterprise Members concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreement, the respective Defendants knew the nature of the Enterprise and Defendants knew that the Enterprise extended beyond each Enterprise Member's individual role. Moreover, through the same connections and coordination, Defendants knew that the other Enterprise Members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

191.    The respective Defendants each agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreement, in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Enterprise Members shared a common purpose, namely, the orchestration, planning,

preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements at issue in this case.

192.     The respective Defendants agreed to facilitate, conduct, and participate in the conduct, management, or operation of each Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

193.     The respective Defendants also agreed to facilitate, conduct, and participate in the conduct, management, or operation of each Enterprise's affairs in order to commit the interstate transportation of money obtained by fraud in violation of 18 U.S.C. §2314.

194.     The participation and agreement of the respective Defendants and each Enterprise Member was necessary to allow the commission of this scheme.

195.     Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

196.     The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, improperly collected loan payments, loss of business and goodwill, and lost profits.

197.     Plaintiffs were forced to make weekly payments pursuant to the MCA agreements that amounted to unconscionable interest rates.

198.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

199.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## THIRD CAUSE OF ACTION
### (Declaratory Relief)

200.    Plaintiffs repeat and hereby incorporate each of the above allegation.

201.    Under controlling New York law, the MCA Agreements are void *ab initio*. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 157 N.Y.S.3d 800, 179 N.E.3d 612 (2021).

202.    A declaratory judgment is required by this Court to determine the rights and obligations of the parties with respect to the MCA Agreements, which are void as a matter of law, and declaring that the Defendants have no right to enforce any security rights and that Defendants are barred from enforcing unconscionable and illegal interest rates on sham loans.

## FOURTH CAUSE OF ACTION
### (Fraud)

203.    Plaintiffs repeat and re-allege each of the above allegations.

204.    Defendants fraudulently induced Plaintiffs to enter into the MCA agreements at issue by misrepresenting the loan and that there would be a subsequent longer-term contract, as discussed above.

205.    Moreover, upon information and belief, Defendants charged Plaintiffs hundreds of thousands of dollars in sham fees relating to the loan, which Defendants fraudulently charged and converted.

206.    Upon information and belief, the Defendants improperly deducted an "Origination Fee" to cover cost of origination and ACH Setup. This fee was fraudulent as it was simply a ploy to extract additional funds from the Plaintiffs and did not actually comprise of related expenses pertaining to origination. None of these fees had any relationship to any services actually rendered and instead were disguised interest charges.

207.    Upon information and belief, the Defendants also deducted an Underwriting Fee for underwriting and related expense. This fee was fraudulent as this was simply a sham to extract more funds from the Plaintiffs. None of these fees had any relationship to any services actually rendered and instead were disguised interest charges.

208.    Defendants also deducted additional sham fees as set forth in the MCA Agreements which were similarly a fraudulent ploy to extract funds from the Plaintiffs by using a sham misnomer characterization of fees.

209.    The MCA Agreements represented that these fees were for services or costs purportedly provided by or incurred by Defendants in connection with the agreements, but, in reality, these services or costs were never provided or incurred or were otherwise provided or incurred for amounts far below those stated in the MCA agreement and the so-called "fees" were nothing more than additional profits reaped by Defendants under the MCA agreements.

210.     For example, the MCA Agreements provided for an "Underwriting Fee" in order "to cover Underwriting and related expenses." However, Defendants performed little or no due diligence and conducted very little underwriting when entering into the MCA Agreements.

211.    Defendants required little more than the completion of an online application and a few bank statements and approved the loan to Plaintiffs in a matter of hours.

212.    Defendants knew that their representations concerning the nature and purpose of the various fees were false and misleading at the time they entered into the MCA Agreements.

213.    These false representations were made in order to induce Plaintiffs into believing that the fees charged to Plaintiffs and deducted from the Purchased Amount of the MCA Agreement were legitimate fees charged to offset the costs of services provided by Defendants under the MCA Agreement.

214.    Plaintiffs reasonably relied upon Defendant's (mis)representations in entering into the MCA Agreements.

215.    Additionally, Defendant NAIR & LEVIN participated in the fraud by preparing and filing false papers in Connecticut asserting an alleged anticipated judgment on behalf of an entity that was not a party to the MCA Agreement in order to freeze and extort a settlement from Plaintiffs.

216.    The respective Defendants have demonstrated a fraudulent scheme. By reason of the foregoing, Plaintiffs are entitled to a judgment against each of Defendants in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (In the alternative, Breach of Contract)

217.    Plaintiffs repeat and re-allege each of the above allegations.

218.    Under the MCA Agreements, Defendants promised to advance certain amounts.

219.    Defendants did not advance the amounts as promised.

220.    As a direct and proximate result of Defendants' breach of the MCA Agreements, and subsequent actions in levying against Plaintiffs' bank accounts, Plaintiffs have been damaged in the amounts described in detail above.

221.    In the event that the Court finds that the MCA Agreements are valid and enforceable and not void *ab initio* as a matter of law, then Plaintiffs are entitled to direct and consequential damages caused by Defendants' breach of the MCA Agreements.

## SIXTH CAUSE OF ACTION
### (42 U.S.C. § 1983)

222.    Plaintiffs repeat and re-allege each of the above allegations.

223.    In response to New York's prohibition against using its confession of judgment statute and related judgment collection procedures against out-of-state residents, Defendants knowingly and purposely devised a scheme to deprive out-of-state residents from their constitutional right to due process under the Fourteenth Amendment of the United States Constitution by abusing the state laws of Connecticut.

224.    In particular, Defendants SIMON and GABE ISAACOV, who are located and reside in Florda, and Defendant GETTER, who is located in and resides in Brooklyn, New York, devised a scheme where they would fraudulently use a Connecticut entity and/or contractual terms applying Connecticut law, and a Connecticut attorney in Defendant NAIR & LEVIN, in order to avail Defendants of Connecticut's prejudgment attachment statute.

225.    The statute, Conn. Gen. Stat. § 52-278(f), is unconstitutional as used by Defendants.

226.    In their form, contracts of adhesion, Defendants require merchants, such as here, to consent to the jurisdiction of two different states, Connecticut and New York, even though Connecticut has nothing to do with the transaction or parties.

227.    In addition, Defendants include a form "Prejudgment Remedy Waiver," requiring merchants to waive "all rights to notice and prior court hearing or court order in connection with any and all prejudgment remedies…"

228.    Then, when the merchant fails to pay for any reason at all, even in the event of a good-faith dispute, such as here, Defendants employ the prejudgment attachment mechanism of § 52-278(f) by serving a Writ of Attachment on the merchant's bank account ***before the filing of a complaint and before serving the merchant.***

229.    In order to utilize its prejudgment attachment remedies, § 52-278(f) provides: "(1)

*the complaint shall set forth a copy of the waiver*; (2) *the plaintiff shall file an affidavit* sworn to by the plaintiff or any competent affiant setting forth a statement of facts sufficient to show that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any known defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff; and (3) the *plaintiff shall include in the process served on the defendant a notice satisfying the requirements of subsections (b) and (c) of section 52-278e*."

230.    These requirements are also plainly spelled out on the court's practice guide:

II.    **PJR When Defendant In Commercial Transaction Has Waived Notice And Hearing (Section 52-278f of the Connecticut General Statutes) - Documents Required**

**Note:** These documents must be served on the Defendant. After service on the Defendant, these documents must be returned underlined electronically to the Court in accordance with the E-Services Procedures and Technical Standards.

A. A Notice of Ex Parte Prejudgment Remedy/Claim for Hearing to Dissolve or Modify (form JD-CV 55) may be used to meet the requirement of notice in Section 52-278f of the Connecticut General Statutes.
B. Signed complaint that includes a copy of the waiver
C. Affidavit by the plaintiff or another person who know the facts personally containing a statement of facts that show probable cause that a judgment in the amount of the prejudgment remedy being asked for, or in an amount greater than the amount of the prejudgment remedy being asked for after considering any known defenses, counterclaims or set-offs, will be rendered in the matter for the plaintiff.

231.    Instead of complying with the letter and spirit of the protections afforded by § 52-278(f), Defendants instead, like here, fire first and ask questions later.

232.    Specifically, Defendants *do not* (1) draft and serve a complaint providing notice to the merchant of its claims; (2) rely upon an affidavit setting forth the facts sufficient to show probably cause; or (3) provide notice to the merchants satisfying subsections (b) and (c) of section 52-278e."

233.    Rather than comply with the dictates of § 52-278(f), Defendants first freeze the

merchant's bank accounts by serving writs of attachment on the bank only, and then immediately demand a settlement under duress and the threat of financial ruin, and only then proceed to court if the extortion attempt fails.

234.    By abusing § 52-278(f), Defendants knowingly and intentionally deprive their merchants of their constitutional due process rights by freezing bank accounts and not even knowing how the bank account was frozen or where to go to seek protection.

235.    For example, here, Defendants froze the Plaintiffs' North Carolina bank accounts by serving a writ of attachment on a Connecticut branch of the various banks.

236.    No notice was provided by Defendants before, during or after the banks froze the accounts. Instead, Plaintiffs had to proactively reach out to their banks to understand what had occurred. Upon information and belief, the papers served on the banks did not include a copy of a complaint identifying the grounds for the claims asserted by Defendants.

237.    Plaintiffs did not voluntarily and intelligently waive their due process rights. *See D.H. Overmyer Co., Inc. v. Frick Co.*, 405 U.S. 174, 31 L. Ed. 2d 124, 92 S. Ct. 775 (1972).

238.    Rather, Plaintiffs (1) were not represented by legal counsel; (2) are unsophisticated business persons; (3) did not have any prior pending actions against them by Defendants; (4) did not have a fair balance of bargaining power; (5) did not negotiate the terms at arms-length; and (6) were knowingly and intentionally taken advantage of by Defendants due to their financial duress.

239.    Defendants knowingly and intentionally deprived Plaintiffs of their due process rights and had no good-faith basis to believe their actions were lawful under the color of state law. *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250 (3d Cir. 1994).

240.    As a direct and proximate cause of Defendants' knowing and intentional violation

of 42 U.S.C. § 1983, Plaintiffs suffered damages by, among other things, not being able to pay for their usual business expenses.

241.    By reason of the foregoing, Plaintiffs are entitled to a judgment against each of Defendants in an amount to be determined at trial.

<u>**SEVENTH CAUSE OF ACTION**</u>
**(18 U.S.C. § 1030)**

242.    Plaintiffs repeat and re-allege each of the above allegations.

243.    As part of the MCA Agreements, Plaintiffs were required to provide RSA with the login information for their bank account.

244.    The Agreement specifically provided that RSA would only log into the account in order to verify the amount of the daily payment and that RSA would carefully safeguard Plaintiffs' confidential information, and only essential personnel will have access to it.

245.    However, RSA exceeded this authority.

246.    Upon information and belief, Defendants logged into the Plaintiffs' bank account in order to try to determine what other financial institutions Plaintiffs used.

247.    Utilizing this information, Defendants then shared this information with their Connecticut attorney, Defendant NAIR & LEVIN, who utilized the Connecticut loophole described above to levy various of Plaintiffs' bank accounts, levying approximately $50,000 over a number of accounts.

248.    Defendants knowingly exceeded their authority and accessed the computer records of a financial institution in order to further their intended fraud and obtains money in excess of $5,000.

249.    Defendants then used this information to freeze and levy approximately $50,000

of Plaintiffs' money.

250.    Plaintiffs have suffered the damages as discussed above.

251.    Under 18 U.S.C. 1030(g), Plaintiffs are entitled to compensatory damages and injunctive relief or other equitable relief.

252.    By reason of the foregoing, Plaintiffs are entitled to a judgment against each of Defendants in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an order from the Court:

a)    Declaring that the Agreements entered into between Plaintiffs and Defendants constitute a loan transaction, and thus are void because they intended to charge and receive a criminally usurious interest rate in excess of 25%;

b)    Ordering Defendants to repay all principal and interest previously paid to Defendants in connection with the criminally usurious loans, including prejudgment interest;

c)    Granting an injunction against Defendants permanently enjoining them from enforcing any of their rights under the criminally usurious loans;

d)    Awarding the Plaintiffs direct and consequential damages in an amount to be proved at trial;

e)    Awarding Plaintiffs treble damages;

f)    Awarding Plaintiffs their attorney's fees and costs incurred in this action; and

g)    Granting such other and further relief as this Court deems just and proper.

Dated: Fresh Meadows, New York
       February 5, 2023

                     /s/ Jonathan E. Neuman
                    JONATHAN E. NEUMAN, ESQ.
                    *Attorney for Plaintiffs*
                    176-25 Union Turnpike, Suite 230
                    Fresh Meadows, New York 11366
                    (347) 450-6710

(718) 228-3689 *facsimile*
jnesq@jenesqlaw.com